FILED

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

JAN 30 PM 1:41

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| JONI DENISE BEELER, | ] | |
| | ] | |
| Plaintiff(s), | ] | |
| | ] | |
| vs. | ] | CV-95-N-2743-NE |
| | ] | |
| AKZO NOBEL INDUSTRIAL | ] | |
| FIBERS, | ] | |
| | ] | |
| Defendant(s). | ] | |

**ENTERED**

JAN 30 1997

### Order

In accord with the Memorandum of Opinion entered contemporaneously

herewith, it is hereby **ORDERED**, **ADJUDGED**, and **DECREED**:

1.    the defendant's motion for summary judgment filed October 21, 1996 is

   **GRANTED**;

2.    the action is **DISMISSED** with prejudice; and

3.    costs are taxed against the plaintiff.

Done, this ___30th___ of January, 1997.

_____
EDWIN L. NELSON
UNITED STATES DISTRICT JUDGE

36

*FILED*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

97 JAN 30 AH 11:10

U.S. DISTRICT COURT
N.D. OF ALABAMA

JONI DENISE BEELER,                    ]
                                       ]
    Plaintiff(s),                  ]
                                       ]
vs.                                    ]     CV-95-N-2743-NE
                                       ]
AKZO NOBEL INDUSTRIAL                   ]
FIBERS,                                ]     *ENTERED*
                                       ]
    Defendant(s).                  ]     JAN 30 1997

## Memorandum of Opinion

### I.   Introduction

Joni Denise Beeler brings this action pursuant to § 107 of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12117, asserting that the defendant, Akzo Nobel Industrial Fibers ("Akzo"), has refused to reasonably accommodate her disability as required by the act. This matter is presently before the court on the defendant's motion for summary judgment, filed October 1, 1996. The motion came under submission at the court's January 28, 1997 motion docket and is now ripe for decision. For the reasons stated herein the motion will be granted.

### II.   Statement of Undisputed Facts[1]

Akzo operates a plant in Scottsboro, Alabama that it bought from Goodyear in 1992. Although Ms. Beeler has been working at this plant since 1980, she has been a Reclaim

---

[1] The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *Cox v. Administrator U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994), *cert. denied, USX Corp. v. Cox*, 114 S. Ct. 900 (1995).

35

Operator since 1993. The duties of that position include operating the reclaim machine and, several times per shift, picking up the reclaimed work from the cable twisting machines. On December 27, 1993, while in the cable twisting area, Ms. Beeler lost consciousness and collapsed. When she regained consciousness, she was being transported via ambulance to the Jackson County Hospital where she was treated and released.

On December 30, 1993, Ms. Beeler saw Dr. Louis Letson, an authorized treating physician for Akzo.[2] When Akzo employees are injured on the job, company policy requires Dr. Letson to approve them to return to work at the plant.[3] In his notes, Dr. Letson wrote that he "suspect[ed]" Ms. Beeler "had a seizure and fell striking her head possibly resulting in mild concussion." *Letson notes* (submitted as *Plaintiff's exhibit 3 to Letson deposition*). He then recommended that Ms. Beeler have a neurological examination, and referred her to Dr. Lee McDaris in Huntsville. Dr. McDaris performed an MRI and EEG on her and monitored her heart for 24 hours. After these tests, Dr. McDaris determined that Ms. Beeler did not demonstrate any evidence of a seizure disorder. Accordingly, on February 10, 1994, Dr. Letson approved the plaintiff to return to work. She returned to her Reclaim Operator job the next day.

Ms. Beeler went to the emergency room again on April 6, 1994, when, while at home, she experienced slurred speech and a tingling sensation in her left hand. Then, on May

---

[2] According to Dr. Letson's deposition, employees who have an injury on the job are routinely seen by him as a follow up to treatment in an emergency room or elsewhere. *See Letson deposition* at 10.

[3] It is undisputed that his recommendation on returning people to work is final.

2

10, 1994, while shopping at Wal-Mart, she fell to the floor, began shaking, and started to roll around in the aisle. During this attack, she severely chewed her tongue and suffered skin abrasions. She was taken immediately to Jackson County Hospital and treated by Dr. V. Snehaprabha Reddy, an internist, who is also the plaintiff's personal physician. Dr. Reddy examined Ms. Beeler and determined that she had suffered a grand mal seizure. She diagnosed the plaintiff with epilepsy and prescribed Tegretol 200mg three times daily. She also released the plaintiff to return to work on May 17, 1994. When Ms. Beeler returned to Dr. Reddy for a follow up visit on May 16, 1994, Dr. Reddy determined that the Tegretol prescription had been therapeutic and was having its desired effect. However, she still made an appointment for the plaintiff to see Dr. Frank Gilliam, a neurologist, at the epilepsy clinic at the University of Alabama in Birmingham. On May 17, 1994, Ms. Beeler presented her return to work certificate to Plant Nurse Susan Basile and told her that she was scheduled to see a specialist at UAB. However, Nurse Basile told the plaintiff that she must wait until after she was seen by Dr. Gilliam before she could return to work.

On July 27, 1994, Dr. Gilliam examined the plaintiff. He determined that because she had had two episodes of altered behavior consistent with epileptic seizures, she satisfied the criteria for a diagnosis of epilepsy.[4] Because, at that time, the plaintiff did not feel ready to return to work, Dr. Gilliam released her to return to work on August 10, 1994. However, when Dr. Gilliam filled out an Akzo form regarding her condition, he placed a number of restrictions on her work, one of which included that she not operate dangerous equipment.

---

[4] The parties argue that two unprovoked seizures will result in a diagnosis of epilepsy.

3

Dr. Gilliam next saw the plaintiff on August 10, 1994, and then again on September 21, 1994. In his attending physician's statement he wrote: "Ms. Beeler has had no seizures during the past three months. She is on Tegretol and a recent level was in therapeutic range. In my opinion this has been a reasonable observation period and she may return to regular duty." *Gilliam Notes of September 21, 1994.* While the parties dispute whether Akzo received a copy of these notes, it is undisputed that the company was made aware of Dr. Gilliam's recommendation.

Workers at the Akzo plant usually work three rotating shifts, remaining on one shift for one week at a time. Akzo regards these rotating shifts as an essential function of the job, which enables the plant to operate 24 hours a day. One of these shifts, the midnight to 8:00 a.m. shift, caused Dr. Gilliam some concern which he expressed to Akzo. By letter of November 3, 1994, he informed the company that "I recommend that Ms. Beeler not work the midnight to 8 a.m. shift until she has been seizure free for 12 months from the date of this letter."[5] The defendants contend that Akzo now had two major concerns: the restriction that Ms. Stafford not be allowed to work on "dangerous machinery," and the shift work situation.[6] However, on November 3, by telephone and letter, Dr. Gilliam told Ron Davis of Akzo that Ms. Beeler was ready to return to work, and that her Reclaim Operator job did not involve the operation of dangerous equipment. He later testified that his concern over rotating shifts was a recommendation, not an absolute restriction.

---

[5] Dr. Gilliam had made this "recommendation" as early as September 21, 1994, by letter to nurse Basile.

[6] There is some evidence in the record that the defendants attempted to place Ms. Beeler in a straight shift office clean-up job that does not involve working with moving machinery. However, the plan was apparently not implemented because of union concerns.

4

On November 23, 1994, the plaintiff had an injury at home after stepping on a piece of notebook paper. She sustained a tibia plateau fracture and a tearing of the knee cartilage. As a result, the plaintiff was incapacitated from November 23, 1994 to February 14, 1995.

On July 5, 1995, the plaintiff returned to Dr. Gilliam for the first time since her September 21, 1994 visit. After this visit, Dr. Gilliam was of the opinion that Ms. Beeler should no longer have restrictions placed on her work and advised Akzo by memo accordingly.[7] Dr. Letson then saw Ms. Beeler and he too released her to return to work without restriction.[8] Thereafter, she returned to work on the Reclaim Operator job on July 31, 1995 with full seniority. She "bid off" that job to the Ply Patroller job in November 1995 and has no complaints since returning back to work.

## III.    Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits,

---

[7] Ms. Beeler's attorney provided Dr. Gilliam's July 5, 1995 "To whom it may concern" memo to Akzo via a July 19, 1995 letter.

[8] It is undisputed that from May 10, 1994 to July 26, 1995, Dr. Letson's opinion had been that Ms. Beeler should be kept off work.

if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. *Celotex*, 477 U.S. at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby,*

6

*Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52; *see also Bill Johnson's Restaurants, Inc. v. N.L.R.B.*, 461 U.S. 731, 745 n.11(1983). However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

7

## IV.  **Discussion**

The ADA provides:

No covered entity shall discriminate against a qualified individual with a
disability because of the disability of such individual in regard to job
application procedures, the hiring, advancement, or discharge of employees,
employee compensation, job training, and other terms, conditions, and
privileges of employment.

42 U.S.C.A. § 12112(a).  The term "discriminate" includes, *inter alia*

not making reasonable accommodations to the known physical or mental
limitations of an otherwise qualified individual with a disability who is an
applicant or employee, unless such covered entity can demonstrate that the
accommodation would impose an undue hardship on the operation of the
business of such covered entity.

42 U.S.C.A. § 12112(b)(5)(A).  In this action, the complaint charges that "[d]espite the

repeated requests of the Plaintiff to return to work, Akzo has refused to make any

reasonable accomodation [sic] to Plaintiff in order to allow her to return to work, despite

the fact that she was not medically restricted from performing her former job duties."

*Complaint* at paragraph 18.[9]

To establish a prima facie case of discrimination under the ADA, the plaintiff must

establish that she:  (1) has a "disability," (2) is a "qualified individual," and (3) is suffering

discrimination "by reason of such disability." 42 U.S.C. § 12132.  It is generally conceded

that cases decided under the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* (1993),

---

[9]  The plaintiff is less than clear about exactly what period of time she was not reasonably accommo-
dated.  Presumably, the plaintiff contends the period begins on May 17, 1994 when she presented her return to
work certificate to Nurse Basile after the Wal-Mart incident of May 10.  That period would end when the plaintiff
began working at her old job again on July 31, 1995--a period of about one year and two months.  However, that
period cannot include the period from November 23, 1994 to February 14, 1995 when the plaintiff was
incapacitated as a result of her injury at home.

provide helpful insight to review of claims arising under the ADA. *See, e.g., Milton v. Bob Maddox Chrysler Plymouth, Inc.*, 868 F. Supp. 320 (S. D. Ga. 1994); *Sawinski v. Bill Currie Ford, Inc.*, 866 F. Supp. 1383 (M. D. Fla. 1994); see also, Interpretive Guidance on Title I of the Americans with Disabilities Act, 29 C.F.R. § 1630.2(g) and (m) (App.) (noting congressional intent to rely on cases interpreting the Rehabilitation Act in reviewing ADA claims).  In addition, the ADA itself, in conjunction with regulations and interpretive commentary, provides useful guidance.

The defendant contends that: (1) the plaintiff is not "disabled" as defined by the Act; (2) that she is not a qualified individual with a disability; and (3) that even if she satisfies the first two criteria, she cannot prove she was the victim of intentional discrimination.

### A.   Disabled Person

The defendant argues that the plaintiff is not "disabled" within the meaning of the ADA. Under the ADA, a person has a "disability" if that person has (1) a physical or mental impairment that substantially limits one or more of the major life activities; (2) a record of such an impairment; or (3) is regarded as having such an impairment. 42 U.S.C. § 12102(2).

The regulations define "physical or mental impairment" as "[a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine . . . . " 29 C.F.R. § 1630.2(h). The plaintiff has presented evidence to support her contention that she suffered from epilepsy which

9

is a neurological disorder.  The defendant presents no evidence in rebuttal.  Accordingly, the plaintiff had a physical or mental impairment while she had epilepsy.

Although epilepsy constitutes a "physical or mental impairment" under the ADA, it does not rise to the level of a "disability" unless it substantially limits a major life activity. *Stradley*, 869 F. Supp. at 443.[10]  "'[M]ajor life activities' are those basic activities that the average person in the general population can perform with little or no difficulty." 29 C.F.R. § 1630.2(i)(App.). They include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Id.*  "An impairment is substantially limiting if it significantly restricts the duration, manner or condition under which an individual can perform a particular major life activity as compared to the average person in the general population's ability to perform that same major life activity." 29 C.F.R. § 1630.2(j)(App.). In determining whether an impairment substantially limits a major life activity, the court should consider: (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment. 29 C.F.R. § 1630.2(j)(2).

Dr. Gilliam testified that, in his opinion, a person with epilepsy has an impairment which substantially limits the major life activity of working. *See Gilliam deposition* at 37. He recognized that persons who have been diagnosed with epilepsy are ineligible for hazardous jobs in the Federal Civil Service unless they have been seizure free, without

---

[10] The defendant does not specifically contest whether epilepsy does so effect an individual.  However, since it contends that the plaintiff does not have a disability as defined by the ADA, the court must address whether epilepsy substantially effects a major life activity.

10

medication, for two years. *See Reynolds v. Brock*, 815 F.2d 571 (9th Cir. 1977). Too, individuals with a history of epilepsy cannot drive trucks in interstate commerce. 49 C.F.R. § 391.41(b)(a). In addition, many states render individuals who have been diagnosed with epilepsy ineligible for drivers licenses unless they have gone without a seizure for a specific period of time. *Reynolds*, 815 F.2d at 574. The Ninth Circuit has held that these types of restrictions amount to a substantial limitation on the plaintiff's ability to work--a major life activity. *Id.* This court agrees. Accordingly, the plaintiff is disabled for the purposes of this motion.

### B. Qualified Individual With A Disability

The defendant next contends that Ms. Beeler is not "qualified" under the Act. The ADA defines "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C.A. § 12111(8). The phrase "essential functions" means the fundamental job duties of the employment position. 29 C.F.R. § 1630.2(n)(1). "'Significantly, these provisions contain no reference to an individual's future ability to perform the essential functions of his position. To the contrary, they are formulated entirely in the present tense, framing the precise issue as whether an individual "can" (not "will be able to") perform the job with reasonable accommodation.'" *Cheatwood v. Roanoke Industries*, 891 F. Supp. 1528, 1536 (N.D. Ala. 1995) quoting *Myers v. Hose*, 50 F.3d 278, 283 (4th Cir. 1995). The question then is whether the plaintiff could perform the essential functions of the Reclaim Operator position, or any job at the defendant's plant as of May 17, 1994 when she first presented Nurse Basile her return to

11

work certificate from Dr. Reddy. Because the plaintiff has presented no evidence that she was qualified for any other job at the Akzo plant in Scottsboro, the court must focus entirely on whether she could perform the essential functions of the Reclaim Operator job. The defendant contends that Ms. Beeler had work restrictions imposed on her which were not actually lifted until July 1995. Therefore, two determinations must be made at this stage. The first is precisely what restrictions were placed on Ms. Beeler, at what periods of time. The second is whether these restrictions prevented her from working in her Reclaim Operator Job.

## 1.   Dr. Reddy's Restrictions

Dr. V. S. Reddy, the plaintiff's personal physician, saw the plaintiff after the Wal Mart incident on May 10, 1994. On that day, Dr. Reddy issued the plaintiff a Jackson County Hospital return to work note saying that she could return to work on May 17, 1994. It is this note that the plaintiff contends qualified her to return to work on that date. However, in depositions, when asked about this note, Dr. Reddy said:

> A    Well, well, we weren't. She needed something to show at work when she's able to work. Then, if she has problems, then she has to come to the office. So, temporarily, usually sometimes they ask at the emergency room, they need certain dates to give. So we are supposed to give some dates. And then if they have problems, we can extend the time. So that's generally what we do here.

*Reddy Deposition* at 45. The defendant contends that this testimony shows that Dr. Reddy's note did not in fact authorize the plaintiff to return to work. But, Dr. Reddy's testimony continues:

Q      And I think -- let me strike that.  Would it be a fair statement that this
       certificate authorized her to return to work on May 17th of '94?

A      Yes.

*Id.* In addition, Dr. Reddy testified:

Q      Okay.  Let's -- let me hand you a document that I've marked as Exhibit
       3, Doctor, and ask you if -- turning to the second page, whether you
       filled out the second page pf Exhibit No. 3?

A      Second page?

Q      Yes, ma'am.

A      That's my husband's handwriting.

Q      Ma'am?

A      That is my husband's handwriting.

Q      Okay.  What about the signature where it -- is that your husband's; is
       that Dr. V. H. Reddy's signature or --

A      Yes.  That's what he said.  V. H. Reddy, yes.

Q      Okay.  And what would have been the occasion for Dr. V. H. Reddy to
       have signed this form?

A      If I am out of town probably.

Q      Okay.

A      Because he was seen on 5/31.  That is the date here.  And this
       handwriting here was 5/31.

                                     * * *

Q      Okay. Now, I guess you can read Dr. V. H. Reddy's handwriting better
       than we can.  And the line where it says, "If still disabled, when should
       patient be able to return to work," I can read the word, "after."

A      Yes.

13

Q      I can read the word, "a" as in apple.

A      Uh-huh.

Q      I cannot read the next word, although I believe it's "neurological."  Am
       I right?

A      After a neurologist.  After a neurologist.

Q      Neurologist, okay.  "Clears for work"?

A      Uh-huh.

Q      "Has an appointment with a neurologist at UAB"?

A      Correct.

*Id.* at 22-24.  Defendant's Exhibit # 3 to Dr. Reddy's deposition is titled "Accident and

Sickness Weekly Benefit Claim."  It is a form provided by the company to the employee

and the attending physician and is expected to be returned to the company for its records.

The second page of the exhibit, referred to in the deposition excerpt, is the Attending

Physician's Statement, which Dr. V. H. Reddy filled out for Dr. V. S. Reddy.  The form is

dated May 31, 1994.

From this deposition testimony, it appears that Dr. V. S. Reddy may have released

the plaintiff to return to work on May 17, 1994.  However, it is undisputed that the plaintiff

told Nurse Basile on May 17 that she was being sent to see a Neurologist at UAB.  That

alone may have been enough to cause Akzo some concern.  Then, Dr. V. H. Reddy returned

the Attending Physician's Statement saying that the plaintiff should not return to work.  In

light of this restriction, it was not unreasonable for Akzo to not return Ms. Beeler to work

14

until after she was seen by Dr. Gilliam. Ms. Beeler was not "qualified" to return to any job until after she saw Dr. Gilliam.[11]

### 2.   Dr. Gilliam's Restrictions

### a.   Operating Dangerous Equipment

Dr. Gilliam did not see the plaintiff until July 27, 1994. On that date he wrote on an Akzo form that she should be returned to work on August 10, 1994 subject to the restriction that "[s]he should not operate dangerous equipment or work at heights." *Defendant's Exhibit # 4 to Beeler Deposition.* Akzo contends first that it did not allow the plaintiff to return to work because the Reclaim Operator Job involves the operation of "dangerous equipment." Neither party has offered evidence describing in detail the reclaim machine or the exact tasks Ms. Beeler must do around that machine. However, Ms. Beeler admitted in her deposition that the "dangerous equipment" restriction would prevent her from working in the Reclaim Operator job.[12] Nurse Basile also testified:

Q   Now, are you familiar with the job of reclaim operator?

A   Somewhat.

---

[11]   In any case, because of the Attending Physician's Statement, the defendant had a legitimate non-discriminatory reason for not returning Ms. Beeler to work before she was released by Dr. Gilliam. Accordingly, she cannot satisfy her burden to prove intentional discrimination under the third prong of the ADA requirements for a prima facie case of discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

[12]   The relevant portion of the deposition is as follows:

Q   . . . But you're not aware of any restrictions that would have prevented you from doing the job of reclaim operator, are you?

A   Other than the one about dangerous machinery. They would have -- they consider every machine down there to be dangerous machinery.

*Beeler Depo.* at 222.

15

Q     That job does not entail the operation of any dangerous machines;
does it?

A     Yes, it does.

Q     Physically operating dangerous machinery?

A     Yes, it does.

Q     Tell me how that happens.

A     Well, if the person wasn't physically alert, they could become caught
in the yarn, they could catch body parts in the moving belts or yarn.

* * *

Q     And what controls do they use to operate that machine?

A     The On and Off switch.

*Basile Deposition* at 28-29. In addition when asked in deposition about Ms. Beeler's restrictions, Mr. Campbell, the plant safety manager, said: "Dr. Gilliam felt she should not work around dangerous equipment, and there's just really no way you can work out there in that work area and not be around dangerous equipment." *Campbell Deposition* at 34.

However, Dr. Gilliam's November 3 letter advised the company that "her current job description does not require the actual operation of dangerous equipment." *Gilliam Letter of November 3.* The defendant contends this opinion is not material because "the statement is phrased in terms of the 'actual operation' of the machine, which entails only the On and Off switch." *Defendant's Initial Brief* at 9.

In any event, there is no genuine issue concerning whether Ms. Beeler would have, upon her return to work, been required to work in and around machinery that would have been hazardous to one, such as she, who was subject to experiencing epileptic seizures.

16

### b.    Rotating Shifts

In the same November 3, 1994 letter to Ron Davis, Dr. Gilliam stated that "[b]ecause sleep deprivation can lower an individual's seizure threshold, I recommend that Ms. Beeler not work the midnight to 8 a.m. shift until she has been seizure-free for 12 months from the date of this letter." *Gilliam Letter of November 3, 1994.* Too, as early as September 21, 1994, Dr. Gilliam recommended that "[i]f it is at all possible, I would recommend that she not alter her work schedule between nights and days, and preferably should work the day shift." *Gilliam Letter of September 21, 1994.* The defendant always has the right to determine the essential functions of jobs at its plant. *See* 42 U.S.C.A. § 12111(8)("consideration shall be given to the employer's judgment as to what functions of a job are essential"); 29 C.F.R. § 1630.2(n)(3)(i) (an employer can determine which functions are essential). It is undisputed that Akzo regards these rotating shifts as an essential function of the job. Rotating shifts in this manner allows the plant to stay in production 24 hours a day. Therefore it appears that the plaintiff could not perform an essential function of her job.[13] Accordingly, the plaintiff was not a qualified individual with a disability after September 21, 1994. Too, for the reasons stated above she was not qualified from May 17, to July 27, 1994. The only period of time where a reasonable jury could determine that she was qualified is the period of time from when Dr. Gilliam first released the plaintiff to return to work on August 10, 1994, until September 21, 1994 when

---

[13] The plaintiff contends Ms. Beeler still could have been placed in the rotating shifts because Dr. Gilliam phrased this "restriction" in the form of a "recommendation." However, the court is unwilling to draw a distinction between the two. Requiring defendants to discern whether doctors have used the "magic words" restricting a plaintiff from work is too great a burden to place on any defendant. Accordingly, for purposes of this motion, Dr. Gilliam's recommendation was, in fact, a restriction.

she imposed the restriction that the plaintiff not work rotating shifts. After September 21, 1994, Dr. Gilliam did not remove all of the plaintiff's restrictions until July 5, 1995. The plaintiff returned to work on the Reclaim Operator Job on July 31, 1995 with full seniority.[14]

### C.   Suffering From Discrimination By Reason of Such Disability

The plaintiff can only satisfy the first two requirements for relief under the ADA for the period between August 10, 1994 and September 21, 1994. However, as to this period, as well as the other periods for which the plaintiff claims relief, she is unable to show intentional discrimination. Intentional discrimination can be proven "by presenting direct evidence of discriminatory intent; by meeting the test set forth in *McDonnell Douglas . . .;* or by demonstrating through statistics a pattern of discrimination." *Early v. Champion International Corp.,* 907 F.2d 1077, 1081 (11th Cir. 1990) (citations omitted).

### 1.   Direct and Statistical Evidence

"Direct evidence of discrimination would be evidence which, if believed, would prove the existence of a fact without inference or presumption." *Carter v. City of Miami,* 870 F.2d 578, 581-82 (11th Cir. 1989). "[O]nly the most blatant remarks, whose intent could be nothing more than to discriminate . . . constitute direct evidence of discrimination." *Id.* at 582. Here the plaintiff has presented no direct evidence that she was discriminated against on the basis of age. Likewise, the plaintiff has presented no statistical evidence that she was discriminated against on the basis of age. Accordingly the plaintiff must show intentional discrimination, if at all, through circumstantial evidence.

---

[14] Eleven days after Ms. Beeler's attorney sent Dr. Gilliam's letter to Akzo, she was reinstated in her old position. Her reinstatement occurred just five days after Dr. Letson approved her to return to work.

18

## 2.    **Circumstantial Evidence**

In an ADA case where a plaintiff's discrimination claim is based on circumstantial evidence, the court employs the shifting-burden framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Olson v. General Electric Astrospace*, 101 F.3d 947, 951 (3d Cir. 1996) ("It is now axiomatic that the familiar analytical framework first pronounced in *McDonnell Douglas Corp. v. Green* . . . for resolution of claims brought under Title VII, also guides an analysis of claims brought under the ADA."); *see also De Luca v. Winer Industries, Inc.*, 53 F.3d 793 (7th Cir 1995). First, the plaintiff has the burden of establishing a prima facie case of discrimination. Second, after the plaintiff has presented a *prima facie* case, the burden of production shifts to the defendant, requiring an articulation of some legitimate, nondiscriminatory reason for the alleged discriminatory employment action. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981). "[I]t is possible for the defendant to present such strong evidence of a nondiscriminatory rationale that summary judgment is warranted." *Brown v. American Honda Motor Co., Inc.*, 939 F.2d 946, 950 (11th Cir. 1991), *cert. denied*, 502 U.S. 1058 (1992) (quoting *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 596 (11th Cir. 1987)).

Once the defendant presents legitimate, nondiscriminatory reasons for its action, then the plaintiff must prove by a preponderance of the evidence that the reasons offered by the defendant are a mere pretext for discrimination, and persuade the fact-finder that the defendant intentionally discriminated against the plaintiff. *McDonnell Douglas*, 411 U.S. at 804. In other words, "[a]fter a . . . plaintiff makes out a prima facie case, and the defendant produces a legitimate, nondiscriminatory explanation for its actions, the

19

*McDonnell-Burdine* presumption drops from the case. At that point, the inquiry is '[whether] the defendant intentionally discriminated against the plaintiff.'" *Harris v. Shelby County Board of Education*, 99 F.3d 1078, 1083 (11th Cir. 1996) quoting *Burdine*, 450 U.S. at 253.

"[B]ecause the plaintiff bears the burden of establishing pretext [for discrimination], he must present 'significantly probative' evidence on the issue to avoid summary judgment." *Isenbergh v. Knight-Ridder Newspaper Sales, Inc.*, 97 F.3d 436, 444 (11th Cir. 1996) (quoting *Young v. General Foods Corp.*, 840 F.2d 825, 829 (11th Cir. 1988) (other citations omitted) (alterations in original). "At the summary judgment stage, once an employer articulates a legitimate, nondiscriminatory reason for the discharge, the burden shifts back to plaintiff to raise a genuine factual question as to whether the stated reason is mere pretext." *Cortin v. Southland Int'l Trucks*, 25 F.3d 1545, 1550 (11th Cir. 1994); *Hairston v. Gainesville Sun Publ. Co.*, 9 F.3d 913, 920 (11th Cir. 1993).

Plaintiff may prove that the defendant intentionally discriminated against him either "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Carter v. City of Miami*, 870 F.2d 578, 584 (11th Cir. 1989). "If the defendant's proffer of credible, nondiscriminatory reasons for its actions is sufficiently probative, then the plaintiff must come forward with specific evidence demonstrating that the reasons given by defendant were a pretext for discrimination." *Brown*, 939 F.2d at 950. "Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [a defendant] has offered extensive

20

evidence of legitimate, non-discriminatory reasons for its actions." *Isenbergh*, 97 F.3d at 444 (quoting *Young*, 840 F.2d at 830).

Assuming, without deciding, that the plaintiff has made out a prima facie case of discrimination, the defendant has articulated a legitimate non-discriminatory reason for not returning her to work, which the plaintiff has failed to rebut. The defendant presents evidence that the plaintiff has had some form of medical restrictions ever since her May 10, 1994 accident at Wal Mart. Dr. Reddy's office sent the defendant notice that the plaintiff should not be returned to work until after seeing Dr. Gilliam. The defendant has always contended that Dr. Gilliam's restrictions prevented it from placing her back in her old position. Akzo insists this was the only reason the plaintiff was not returned to work. The plaintiff has produced no evidence that this reason was a mere pretext. Accordingly, even if the plaintiff could prove she was a qualified individual with a disability, she has not proven that she was intentionally discriminated against. Therefore, the defendant is entitled to judgment as a matter of law.

## V.   **Conclusion**

For the above stated reasons, the defendant is entitled to judgment as a matter of law. Accordingly, the defendant's motion for summary judgment will be **GRANTED**. The case will be **DISMISSED**, with prejudice.

Done, this 30th of January, 1997.

EDWIN L. NELSON
UNITED STATES DISTRICT JUDGE

21